1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ISMAEL JESUS PEREZ, | ) | 1:09-CV-00667 OWW GSA HC |
| | ) | |
| Petitioner, | ) | FINDINGS AND RECOMMENDATION |
| | ) | REGARDING PETITION FOR WRIT OF |
| v. | ) | HABEAS CORPUS |
| | ) | |
| FRANCISCO JACQUEZ, Warden, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

17
18
19
20
21
22
23
24
25
26
27
28

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**PROCEDURAL BACKGROUND**

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Kern, following his conviction by jury trial on November 7, 2006, of first degree murder (Cal. Penal Code § 187(a)) with use of a firearm (Cal. Penal Code § 12022.53(c)-(d)), and possession of a firearm by a convicted felon (Cal. Penal Code § 12021(a)(1)). (LD[1] 4:2.) The trial court also found true the prior conviction allegations. (LD 4:2.) Petitioner was sentenced to serve an indeterminate term of 80 years to life in state prison. (LD 4:2.)

---

[1]"LD" refers to the documents lodged by Respondent with his response.

1    Petitioner timely appealed to the California Court of Appeals, Fifth Appellate District

2    (hereinafter "Fifth DCA"). On May 27, 2008, the Fifth DCA affirmed the judgment in a reasoned

3    opinion. (LD 4.) Petitioner then filed a petition for review in the California Supreme Court. (LD 5.)

4    On August 22, 2008, the California Supreme Court summarily denied the petition. (LD 6.)

5    On April 14, 2009, Petitioner filed the instant federal habeas petition.  Petitioner raises the

6    following grounds for relief: 1) The prosecutor committed misconduct by arguing to the jury that

7    defense counsel's alternative fallback argument for conviction on a lesser-included offense should be

8    viewed by the jury as a concession on the issue of Petitioner's identity as the perpetrator; 2) Jury

9    instruction CALCRIM No. 316 is a constitutionally defective instruction which improperly permits

10   the jury to disregard evidence that a prosecution witness has engaged in criminal conduct in

11   evaluating his or her credibility; 3) Trial counsel rendered ineffective assistance of counsel in failing

12   to request jury instruction CALCRIM No. 522; and 4) Cumulative error. Respondent filed an answer

13   to the petition on September 8, 2009. Petitioner did not file a traverse.

14                          **FACTUAL BACKGROUND**[2]

15   Angelina had known defendant about 10 years. They had lived together on and off for
     about eight years and they had two children together. Defendant went by the nickname "Little
16   Man." Even though they were no longer together, defendant would send Angelina letters
     expressing his love for her.
17
     Angelina moved into a rental house about three weeks before the shooting. Their two
18   children lived with Angelina's mother. A few days before the shooting, defendant came over
     and asked to leave his clothes and things at Angelina's house, but she refused because she did
19   not want him to feel that it was his house and he could do whatever he wanted. Defendant
     was "kind of mad or upset."
20
     On Saturday, April 29, 2006, Angelina was working at a Fastrip store.[FN2] She worked
21   from 4:00 p.m. until midnight. When she got home, her friend, Ann, was already at her
     house. About 15 or 30 minutes later, Cesar arrived. Angelina and Cesar were dating. Cesar
22   drove a rental car and parked it in front of her house. When he came inside, Angelina showed
     him around her new house and then they went into her room to talk. Ann stayed in the living
23   room and watched television.

24   FN2. All dates refer to 2006 unless otherwise noted.

25   At about 3:00 a.m., defendant knocked on the door. Angelina opened the door and
     went outside to talk to him because she did not want him to come inside. She stood in front
26   of the door and held the knob to block him from going in the house. She yelled at Ann to lock

27   ───────────────────

28   [2]The factual background is taken from the opinion of the state appellate court and is presumed correct. 28
     U.S.C. § 2254(e)(1).

the door and she heard it lock. Defendant asked Angelina, "Who is inside?" He asked her if her ex-boyfriend, Chuckie, was inside and she told him he was not. She told him no one was inside and she repeatedly told him to leave. Defendant was angry. Angelina had seen him angry before; he was acting just as he had during the 10 years she had known him.

Ann opened the door slightly and saw Angelina and defendant talking. Ann saw defendant's car parked in front of the house. Ann asked if everything was okay.

At one point, defendant yelled at Angelina, "'Tell that punk motherfucker to come outside and quit being a bitch.'" He noticed Cesar's rental car and said, "'Oh, is that his car?'" Defendant got into Cesar's rental car and started going through things. He pulled on the GPS device attached to the dashboard. Angelina yelled at him to get out of the car and she threatened to call the police. She went to him and pulled him out of the car. They continued arguing and she told him he had to leave. He told her, "'So long as I'm not happy, you are not going to be happy.'" She told him she "wasn't happy anyway so what he was doing there wasn't fazing [her] so he needed to quit acting like a kid and just leave." He turned around, got in his car and drove away. Angelina went back inside the house. According to Ann, Angelina did not appear upset. She was normal and quiet.

Between 15 and 60 minutes later, Ann decided to go home. She was going to walk, but Cesar offered her a ride. Angelina decided to go along, so the three of them left the house and walked toward Cesar's car. Cesar got in the driver's seat, Angelina got in the front passenger seat, and Ann got in the back seat behind Angelina. After Angelina got in, she sat forward in her seat as she examined a CD. All the car doors were shut and Cesar started the car. Angelina heard a tap at Cesar's window. She turned her head to the left and immediately heard gunshots. There was a pause in the shooting and she heard someone say, "'fuck.'" She recognized defendant's voice, his frustration, and his distinctive manner of speaking that word. When she heard the word, she had no doubt it was defendant speaking it. She saw the figure of the shooter and knew the shooter was defendant. It appeared that his gun had jammed and he was sliding it back to clear it. Then she heard more gunshots. Ann ducked down. Cesar had already started driving away.

Angelina's neighbor heard the gunshots at about 3:40 a.m. A minute or so later, the neighbor looked out the bedroom window and saw a man running to a car. He was Hispanic and he appeared to be about five feet four inches or five feet six inches tall and weigh approximately 150 to 170 pounds. The man got in the car and drove away. The neighbor did not see his face and could not identify him later. Another neighbor had seen the same car earlier that night at about midnight.

After driving a short distance, Cesar started to swerve. Angelina asked him if he was hit but he could not answer. She told him to stop so she could drive him to the hospital. He stopped the car and she ran around to his side. Angelina could not move Cesar, so she tried to put the car in park. Cesar's foot slid off the brake and hit the accelerator. The car took off and crashed into a light pole. Angelina was knocked to the ground. When she got up, she looked back to be sure defendant was not coming up the street to continue shooting at them. She ran to the car and found Cesar slumped over and coughing up blood. Ann was on the floorboard in the back.

Angelina stirred Ann and tried to convince her they should leave before the police arrived. She told Ann, "'We gotta go.'" Ann did not want to leave, so Angelina told her what they would say to the police. She said, "'Okay, when the cops come, you just tell them that I still live at your house and that we were going to the store for some beer and we were driving down the street and we just heard shots fired.'" Their story would implicate drive-by shooters. Ann wanted to tell the truth, but it was Angelina's instinct to avoid talking to the police. She did not want to be known as a "snitch" and she was afraid someone would take

retribution against her for talking to the police. She feared for the safety of her children and herself.

When the police arrived at the scene of the crash, they put Angelina and Ann in separate vehicles. Angelina told them the story she had fabricated. As Angelina sat in the police vehicle with an officer, at about 3:50 a.m., she received a cell phone call from defendant's friend, Abel. He asked her if she was okay.

Defendant made four calls on his cell phone between 1:30 a.m. and 3:47 a.m., all of which were placed from a region around Angelina's house.[FN3]

> FN3. The electronic surveillance investigator for the district attorney testified that cell phone technology could locate within a square mile or so the location from which a call was placed or ended.

Detective Jelletich arrived on the scene at about 4:30 a.m. He spoke first to Ann, but he did not believe her story about the drive-by shooting. Angelina was more willing to speak to him, but she told him the same story. After Ann told the police that Little Man, the father of Angelina's children, had been to the house earlier and had argued with Angelina, the detectives approached Angelina again. She then told them a second story. This time, she described an ex-boyfriend coming to the house earlier, but she identified Little Man as Ian T. She said she had not see the shooter so she could not identify him as Ian T. She described his car as a two-door silver-grey Pontiac. Angelina knew Ian T. had died in 2000; she did not identify defendant because she did not want to be a snitch.

Detective Bonsness arrived at about 5:00 a.m. He observed Cesar's rental car, driven up onto the curb and crashed head-on into a light pole. The engine hood was crumpled and the right front tire was flat. The driver's window and the left rear passenger windows were shattered. There were multiple bullet holes in the driver's side of the car and two in the back of the driver's headrest. One bullet went all the way through and the other remained lodged in the headrest. The angle of those shots indicated they came from above and left. If the bullets had continued on, they would have traveled toward the car stereo in the front console, to the right of the steering wheel. The windshield appeared to have been shot from the inside and there were two bullet strikes on the rearview mirror. Glass fragments were on the back seat. The steering wheel and dash were covered with blood splatter and blood also stained the center console. The floor around the accelerator and brake pedal was covered with shattered glass. Cesar's shirt, cut off by medical personnel, contained two bullet holes, one on the left back and one on the left sleeve. The top of the center console was broken off. A lighter was in the cup holder.

In the area in front of Angelina's house, Detective Bonsness found a large amount of broken glass and several spent nine-millimeter shell casings that had been ejected from a semi-automatic pistol. There were five casings on the street in front of the house and eight more trailing on the street around the corner, indicating that the shooter had been moving as the shots were fired. One of the casings was dented on the front end, which was evidence the casing had become jammed in the pistol and had to be cleared by racking the slide to eject the casing. A nearby Toyota Tercel had been hit by three shots and its right rear passenger window was shattered. Neither defendant's fingerprints nor his DNA were found at either scene. No vehicle associated with defendant was found.

Cesar had been shot twice. The bullet lacerating his lung and pulmonary artery was fatal.

Meanwhile, at the police station, Detective Jelletich continued interviewing Angelina. She said Ian T. had been at her house that night. The detective obtained a booking photo of

Ian T., which Angelina verified. But when the detective showed Ann a photographic lineup containing Ian T., she said that Little Man was not in the lineup.

At about 5:15 a.m., defendant called his friend and coworker, Steve. Steve's girlfriend answered the phone and defendant asked her if Steve had left for work. Then defendant called again to ask why Steve had not gone to work. She explained that Steve was not at home because they had gotten in an argument.

Defendant called his friend, Sean, and asked if he could stay at his house because he was in a bind and needed a place to stay. Defendant said the police wanted to ask him some questions about something he had not been involved in. He said he needed a ride somewhere south. Sean let defendant stay at his house while he waited for a ride out of town.

Later that morning, Angelina's mother drove past Angelina's house on her way to work and saw the police tape on the street and around the house. She thought something had happened to Angelina, so she returned home and called defendant. She asked him if he knew what had happened to Angelina and if she was okay. He said he did not know anything. He said he would go to Angelina's house to check and call her back. He never called. Angelina's mother called him several times from work later that day but he did not answer.[FN4] Angelina later told her mother what had happened. She told her she did not see the shooter's face, but she did see his body.

FN4. The custodian of records for Sprint Nextel testified that the last call received on defendant's cell phone on April 30 was at 7:03 a.m. After that, all incoming calls went to his voicemail. Detective Bonsness testified that during his investigation he placed numerous calls to defendant's cell phone and received a voicemail message as follows: "This is [defendant]. I'm unavailable to answer the phone so leave your name and number. I'll get back to you as soon as possible. Thanks. Bye." The detective recognized the voice as defendant's.

According to the custodian, on May 5, defendant's cell phone number was deactivated and a different number was activated. The subscribing customer, however was not defendant, but Oscar E.

Oscar E. testified that he did not know defendant. In April, Oscar had a cell phone account through Sprint, but it did not include defendant's number. When Oscar was billed for defendant's number plus two others that were not his, he contacted Sprint and the company opened an investigation.

The detectives attempted to locate Ian T., but on May 1 they discovered he was deceased. They unsuccessfully attempted to contact Angelina at her home and on her cell phone.

On May 2, the detectives located Ann at her home and spoke to her again. Her taped interview was played for the jury. According to Detective Jelletich, Ann's demeanor was more cooperative and forthcoming during this interview; however, when the detectives presented her with a photographic lineup that included defendant, her demeanor changed immediately and she stated she could not identify anyone. She became difficult and uncooperative. She stated her concern about being a snitch and having to identify someone in court. She appeared nervous and upset.

During this interview, the detectives learned that defendant and Angelina had two children together. The detectives became concerned that defendant or Angelina might abduct the children, who were staying with Angelina's mother. The detectives had been unable to contact Angelina for two days.

The detectives contacted Child Protective Services the same day and confirmed that the children were in the custody of Angelina's mother. The children were already wards of the court. The detectives and a CPS representative went to Angelina's mother's house. When they were there, Angelina happened to call her mother and Angelina spoke to the detectives on the telephone. They asked her where she was and told her they were going to pick up her children for their safety. She told the detectives she would reveal her location if they would leave her children at her mother's house, but the detectives took the children into protective custody.

The detectives interviewed Angelina and told her they knew Ian T. was dead. They told her she needed to do the right thing and start telling the truth. At first, she did not like being told what to do, but upon reflection she agreed that telling the truth was the right thing and the only way Cesar could rest in peace. Although she was upset that her children had been taken into protective custody, it did not influence what she told the detectives. She identified defendant as Little Man and she identified him as the shooter from a photographic lineup.

After the shooting, defendant stayed at Sean's house for five or six days until Sean's friend, Brian, gave him a ride out of town. On May 8, officers located defendant in Arroyo Grande, California. Defendant falsely identified himself as David Prez. In his motel room, the officers found a large duffel bag containing a backpack, men's clothing and an envelope of documents. The photographic identification inside the envelope bore defendant's personal information.

When Detective Jelletich received word that defendant had been arrested, he and Detective Bonsness drove to Arroyo Grande to pick him up. When Detective Jelletich interviewed defendant, he acknowledged knowing Angelina and having been at her house in the past, but he denied having any knowledge about a shooting or murder at her house or that police were looking for him. He also denied having a cell phone, even when confronted with his personal voicemail message. He said he was unemployed and had no permanent resident around the time of April 30. On the night of April 29, he was staying with Steve.

Defendant acknowledged that he and Angelina had been split up for a year and a half and he explained that he did not want another man with her around his children. However, he said it would not have bothered him if a man named Chuckie had been at Angelina's house on April 30. Defendant denied contacting Angelina's mother the morning of April 30, and he denied knowing anyone named Brian. When asked how he got to Arroyo Grande, he said he got dropped off on May 9. He said it was irrelevant who dropped him off and he denied that it had been Brian. Defendant explained he possessed only a plastic grocery bag of belongings.

After Angelina spoke to the detectives, she fled. She was afraid and wanted to avoid testifying. First, she went to Riverside, then to Nevada. When she returned to Bakersfield for a week or two, the district attorney's investigator located her at Ann's house. Angelina told the investigator she was not the person he was looking for. He showed her that he had her photograph and he tried to convince her to do the right thing. He served her with a subpoena, but she did not show up for the court appearance. After that, she went to Big Bear for a month or more, and then to Florida for a few weeks. She knew law enforcement was looking for her. During one of Angelina's absences, Detective Jelletich stayed in contact with her via her cell phone.

In July, the district attorney's investigator located Ann and served her with a subpoena. Ann told the investigator that she saw defendant shoot Cesar and there was no way she would testify in court.

When Angelina was in Marysville, she received a message on her cell phone from the district attorney's investigator, asking her to call back. The week before trial, the investigator

went to Marysville to meet her and bring her back to Bakersfield. The investigator had been looking for her for two months. Angelina had remained in custody since then, not only because there was a warrant for her because she was a necessary witness in this case, but also because a misdemeanor embezzlement charge was pending against her. The district attorney had agreed that her testimony could not be used against her in other cases, but had not made any other deals or promises in exchange for her testimony. Angelina finally decided to testify because she was tired of running and tired of her guilty conscience. She wanted to get on with her life.

On cross-examination, Angelina testified she returned to work at Fastrip after her interview on May 2 until she was arrested on July 7 for embezzlement. After she was bailed out, she left town. She ran to avoid testifying in this case, not because she was charged with embezzlement. She denied stealing from Fastrip, but when she agreed to testify, she did hope to obtain immunity in her embezzlement case.

### Defense Evidence

The public defender's investigator testified that she interviewed Angelina on October 25, a day or so before trial began, while she was in custody. Angelina told the investigator she had not seen the shooter and did not know who the shooter was. She said she had been in hiding because of the shooting. When she learned that the police had picked up her children, she called the police to tell them Little Man had committed the shooting. She told them this to ensure she could get her children back. She said she had received threats from the police about taking her children and she had received threats from Cesar's friends who wanted her to testify.

Officer Wilson testified he was dispatched to Fastrip on July 8 regarding an embezzlement investigation. When he spoke to Angelina, she told him, "'Hey, there are a lot of other people here that make money orders, I'm not the only one.'" He asked her if she knew anything about using other employees' access numbers. She said she only used her own number. But when he told her she had been videotaped using someone else's access number, she said, "'If you want me to, I can pay it all back.'"

The owner of Fastrip testified he had known Angelina for over seven or eight months. He believed she had committed fraud and embezzlement. When a customer came into the store to pay for gas with a credit card, Angelina rang up his sale and also rang up a separate charge for a $500 money order on his credit card. When she did so, she used another employee's code. She did this a second time to another customer. When one of the customers came in to complain about the $500 charge, the owner investigated the register and the surveillance videotape. The tape showed Angelina making the two money orders with another employee's code.

Ann denied telling an investigator that although she watched defendant shoot and kill Cesar, she would not testify. She also never told a detective, investigator or police officer that she recognized the shooter as defendant.

(LD 4:2.)

### DISCUSSION

### I.  Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of

the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); <u>Williams v. Taylor</u>, 529 U.S. 362, 375 fn.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. In addition, the conviction challenged arises out of the Kern County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 2241(d). Accordingly, the Court has jurisdiction over the action.

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. <u>Lindh v. Murphy</u>, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); <u>Jeffries v. Wood</u>, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* <u>Drinkard v. Johnson</u>, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* <u>Lindh v. Murphy</u>, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

## **II. Legal Standard of Review**

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996. <u>Lockyer v. Andrade</u>, 538 U.S. 63, 70 (2003). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); <u>see</u> <u>Lockyer</u>, 538 U.S. at 70-71; <u>see</u> <u>Williams</u>, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" <u>Lockyer</u>, 538 U.S. at 71, *quoting* 28 U.S.C. § 2254(d)(1). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time

of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id.

Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. See Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

AEDPA requires that we give considerable deference to state court decisions. The state court's factual findings are presumed correct, 28 U.S.C. § 2254(e)(1), and we are bound by a state's interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

1    **III.  Review of Petition**

2         **A.  Ground One**

3         In his first claim, Petitioner alleges the prosecutor committed misconduct by suggesting that

4    defense counsel's argument regarding voluntary manslaughter may have been an admission of

5    Petitioner's guilt. Petitioner argues the prosecutor violated his constitutional rights by implying

6    defense counsel believed Petitioner was guilty of killing the victim.

7         *1.  Factual Background*[3]

8         During defense counsel's closing argument, he stated the following:

9         "In terms of murder, you will be looking at instruction No. 525, and it talks about
     murders.... [¶] And then we go down to another section which is this: 'A decision made to
10   kill rashly, impulsively or without careful consideration is not deliberate and is not
     premeditated.' [¶] I don't believe that there is enough evidence to convict [defendant] of
11   murder in the first degree, murder in the second degree, even manslaughter. I don't believe it
     because I don't believe [Angelina] or [Ann]. I do not believe them. I don't believe it. But if
12   you start to weigh it, remember that a decision to kill rashly, impulsively or without careful
     consideration is not deliberate or premeditated.

13

14        "Interestingly, when [the prosecutor] started to talk to you, he mentioned
     manslaughter a few times and he actually said he wasn't going to talk to you about it and I
     wasn't quite sure that he didn't talk to you about it. But nevertheless, one of the things that he
15   talks about in this case is motive. And what does [the prosecutor] say about motive?
     Basically he says, you know, there was an argument, [defendant] was a jealous man, he called
16   the other guy out, hey, come out of this house whoever you are and [defendant] used some
     terms that most of us don't use on a regular day and certainly wouldn't use in the courtroom,
17   called the guy out. He said some other things, all of which pointed in the direction, according
     to [the prosecutor], to the motive. [¶] Well, if [the prosecutor] is pointing you in that
18   direction, that motive is a manslaughter motive. That's not a murder first degree, second
     degree motive. He is pointing you in that direction. His motive points you in that direction.
19   [I]f you look at the manslaughter instruction, what it says is, 'The defendant killed someone
     because of a sudden quarrel or in a heat of passion if the defendant was provoked. As a result
20   of the provocation, the defendant acted rashly and under the influence of intense emotion that
     obscured his reasoning or judgment.' And that's where [the prosecutor] pointed. He said, you
21   know, this guy is in love, he read you a couple letters, ... he showed [defendant] was still in
     love and he might be jealous and that would be the motive.... [¶] Basically [CALCRIM No.
22   570] says, 'The People have the burden of proving beyond a reasonable doubt that the
     defendant did not kill as a result of a sudden quarrel or in the heat of passion.' It seems to me
23   that while they have that burden, they certainly haven't met it and they have, in fact, pointed
     the case in that direction."

24   Defense counsel also explained attempted voluntary manslaughter for the jurors, as follows:

25
          "We move from attempted murder, two counts down, to attempted voluntary
26   manslaughter. 'An attempted killing that would otherwise be attempted murder is reduced to

27   _____

28        [3]The factual background for this claim is taken from the opinion of the appellate court. (LD 4:13-
     14.)

attempted voluntary manslaughter if the defendant attempted to kill someone because of a sudden quarrel or in [the] heat of passion....' ... The defendant attempted to kill [ ] because he was provoked. The provocation would have caused a person of average disposition to act rashly and without due deliberation and that is from passion rather than from judgment. And most of us would say there is no reasonable man who would kill anybody over a wife that they found sleeping with a neighbor or any of that and yet the law classically recognizes that as voluntary manslaughter. You got so upset you couldn't see straight, you saw red, you killed a guy that was sleeping with your wife. Voluntary manslaughter.... [R]easonable men don't kill people. But there are situations that the law recognizes so provoke[ ] men that they will kill, and under those circumstances the law recognizes it as manslaughter."

In his rebuttal argument, the prosecutor said the following, to which defendant now objects:

"I'm sitting hearing and I'm listening to the defense and I'm listening to their defense in this case, and there are a few questions that kind of popped into my head. One was when bringing up voluntary manslaughter, is that an admission that the defendant was the shooter? That's something that I thought about because why, if you weren't there and you didn't shoot, why would you even think about second-degree murder or voluntary manslaughter? There is all of a sudden a plea during their defense saying, now, wait a minute, the People haven't proved that this wasn't done rashly or heat of passion doesn't apply because if heat of passion could apply, then it's voluntary manslaughter so consider that. Well, why even go that far, right? I mean, if you are [defendant] and [defendant] is innocent until proven guilty and the defense is I didn't do it, someone else did, then why even argue? That's just something that I was thinking."

## *2.  Analysis of Claim by State Court*

This claim was presented on direct appeal to the Fifth DCA, where it was rejected in a reasoned opinion. (LD 4:12-17.) Petitioner then presented the claim to the California Supreme Court where it was summarily denied. (LD 6.) The California Supreme Court, by its "silent order" denying review of the Fifth DCA's decision, is presumed to have denied the claim presented for the same reasons stated in the opinion of the Fifth DCA. Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

The Fifth DCA rejected the claim as follows:

"'The applicable federal and state standards regarding prosecutorial misconduct are well established. "'A prosecutor's ... intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." '"[Citations.]"' (*People v. Smithey* (1999) 20 Cal.4th 936, 960.) A prosecutor's comments may "'so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process.'[Citation.]" (*Darden v. Wainwright* (1986) 477 U.S. 168, 181; *People v. Hill* (1998) 17 Cal.4th 800, 819.) Under state law, a prosecutor who uses deceptive or reprehensible methods to persuade either the court or the jury has committed misconduct, even if such action does not render the trial fundamentally unfair. (*People v. Smithey, supra,* at p. 960; *People v. Hill, supra,* at p. 819).)

If a prosecutorial misconduct claim is based on the prosecutor's arguments to the jury, we consider how the comments would, or could, have been understood by a reasonable juror in the context of the entire argument, and whether there is a reasonable likelihood that the jury construed or applied any of the questionable remarks in an objectionable fashion. (*People v. Smithey, supra,* 20 Cal.4th at p. 960.) No misconduct exists if a juror would have

taken the remarks to state or imply nothing harmful. (*People v. Benson* (1990) 52 Cal.3d 754, 793.) To preserve a claim of prosecutorial misconduct for appellate review, a defendant must raise a timely and specific objection and, where practical, request a curative admonition. (Evid.Code, § 353; *People v. Noguera* (1992) 4 Cal.4th 599, 638.) Absent such an objection and request for admonition, any error is forfeited. (*People v. Noguera, supra,* at p. 638.)

Prosecutorial misconduct requires reversal only if it prejudices the defendant. (*People v. Fields* (1983) 35 Cal.3d 329, 363.) Where it infringes upon the defendant's constitutional rights, reversal is required unless the reviewing court determines beyond a reasonable doubt that the misconduct did not affect the jury's verdict. (*People v. Hall* (2000) 82 Cal.App.4th 813, 817, citing *People v. Harris* (1989) 47 Cal.3d 1047, 1083.) Prosecutorial misconduct that violates state law only is cause for reversal when it is reasonably probable that a result more favorable to the defendant would have occurred had the prosecutor refrained from the untoward comment. (*People v. Milner* (1988) 45 Cal.3d 227, 245.) We presume the jury relied on the trial court's instruction on the law rather than upon the prosecutor's comments. (*People v. Morales* (2001) 25 Cal.4th 34, 47.)

In *People v. Bell, supra,* 49 Cal.3d 502, upon which defendant relies, the prosecutor argued in rebuttal "that defense counsel had spent some time on the special circumstances issues, 'and for a man who says that his client didn't commit the crime, that must be a waste of time. But, on the other hand, he might be worried that he did commit it.'" (*Id.* at p. 537.) The court explained: "It is improper for a prosecutor to argue to the jury as an analysis of the defense argument or strategy that defense counsel believes his client is guilty. [Citation.] [¶] The People suggest that the remark was not improper here since the prosecutor was not making a factual statement of defense counsel's belief, but was simply pointing out the 'internal disharmony' between the defense theories that the crimes were not premeditated and that the charge against defendant involved mistaken identity. A similar argument was rejected in [*People v.*] *Purvis* [(1963)] 60 Cal.2d 323, and is equally unavailing here. There is no inconsistency in denying that an accused was the perpetrator of an offense while simultaneously arguing that no matter who committed it the crime was not premeditated. We note also that while comment on apparent inconsistencies in argument is permissible, defense counsel's personal belief in his client's guilt or innocence is no more relevant than the belief of the prosecutor. [Citation.] Inviting the jury to speculate about such belief is misconduct." (*People v. Bell, supra,* at pp. 537-538; see also *People v. Thompson* (1988) 45 Cal.3d 86, 112 [it is "improper for the prosecutor to argue to the jury that defense counsel does not believe in his client's defense"].)

In this case, assuming the claim was not forfeited, we conclude the prosecutor's comments did not invite the jury to wonder or believe that defense counsel thought defendant was guilty. Instead, the comments pointedly highlighted the apparent contradictions in defendant's case. In *People v. Welch* (1999) 20 Cal.4th 701, the Supreme Court held that very similar comments did not constitute misconduct. The prosecutor in *Welch* "referred to the contradiction in the defense-that on the one hand, defendant testified that he did not commit the murders, and on the other, trial counsel tried to prove that defendant did not premeditate and deliberate. The prosecutor stated: 'So, the basic defense is I'm not guilty because I wasn't there. But if you find me there and don't believe me, it is only second-degree murder because of my mental delusions and mental impairment.... Remember that. Remember that. They want it both ways.'" (*Id.* at p. 752.) The court concluded: "It is no misconduct to pointedly highlight, as the prosecutor did here, the contradictions in a defendant's case. [Citation.]" (*Id.* at p. 753; *People v. Chatman* (2006) 38 Cal.4th 344, 385 [same; prosecutor commented on discrepancies between defense counsel's opening statement and defendant's actual testimony, and pointed out gaps in defense counsel's argument]; *People v. Bell, supra,* 49 Cal.3d at p. 537 [comment on apparent inconsistencies in argument is permissible].) We believe the prosecutor's comments in this case were a variation on *Welch's* theme and therefore were not misconduct.

> But even if the prosecutor's comments could be viewed as suggesting defense counsel believed defendant was guilty, in the context of defense counsel's emphatic argument that he did not believe there was sufficient evidence to convict defendant of *anything* because he did not believe the testimony of either Angelina or Ann, we conclude there was no possibility the comments accomplished this end. Thus, if the comments were misconduct, they were harmless under any standard.

(LD 4:14-17.)

### 3. Federal Standard and Review of Claim

A petitioner is entitled to habeas corpus relief if the prosecutor's misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974).  To constitute a due process violation, the prosecutorial misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." Greer v. Miller, 485 U.S. 756, 765 (1987), *quoting* United States v. Bagley, 473 U.S. 667 (1985).  Any claim of prosecutorial misconduct must be reviewed within the context of the entire trial. Greer, 485 U.S. at 765-66; United States v. Weitzenhoff, 35 F.3d 1275, 1291 (9th Cir. 1994). The court must keep in mind that "[t]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor" and "the aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused." Smith v. Phillips, 455 U.S. 209, 219 (1982).

"Improper argument does not, per se, violate a defendant's constitutional rights." Thompson v. Borg, 74 F.3d 1571, 1576 (9th Cir.1996), *quoting,* Jeffries v. Blodgett, 5 F.3d 1180, 1191 (9th Cir.1993)). A violation of a defendant's constitutional rights occurs only where the prosecutor's remarks so infect the trial with unfairness as to make the resulting conviction a denial of due process. Donnelly, 416 U.S. at 643.

Even if prosecutorial misconduct is established, and it was constitutional error, the error is considered harmless if it did not have a "substantial and injurious effect or influence in determining the jury's verdict" or did not result in actual prejudice. Brecht v. Abrahamson, 507 U.S. 619, 637-38 (1993); Thompson v. Borg, 74 F.3d 1571, 1577 (9th Cir.1996).

In this case, the state court reasonably concluded the prosecutor's remarks were not misconduct. The prosecutor did not argue that defense counsel believed his client was guilty. He also

did not invite the jury to wonder or believe that Petitioner was guilty. He made no misrepresentations, he did not misstate the law or mischaracterize the evidence, and he did not act deceptively. What the prosecutor did was comment on the apparent contradictions in the defense. It is permissible to point out problems in opposing counsel's arguments.  Moreover, the prosecutor made the remarks at issue during his rebuttal and the comments were directed at the disharmony in defense counsel's closing. The remark was an isolated event. Where a "consistent and repeated misrepresentation of a dramatic exhibit in evidence may profoundly impress a jury and may have a significant impact on a jury's deliberations . . . ., [i]solated passages of a prosecutor's argument, billed in advance to the jury as a matter of opinion not of evidence, do not reach the same proportions." Donnelly, 416 U.S. at 646. "Such arguments, like all closing arguments of counsel, are seldom carefully constructed in toto before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear." Id. at 646-47. Therefore, Petitioner has not demonstrated the state court determination that the prosecutor did not commit misconduct was unreasonable.

Moreover, the evidence against Petitioner was overwhelming. Even if the prosecutor's alleged misconduct was considered constitutional error, the error was harmless. Petitioner was identified as the shooter by his girlfriend of 10 years. (RT[4] 194.) The shooting took place outside the girlfriend's home after Petitioner had confronted her, demanded the victim come out of the house and face Petitioner, and then vandalized the victim's vehicle. (RT 116-122, 129-141, 177-182.) The girlfriend identified Petitioner as the assailant from his appearance at the car's window and his voice when the gun had jammed. (RT 194.) In light of the evidence, the state court reasonably determined that any prosecutorial error was harmless under any standard of review. The claim should be denied.

**B.  Ground Two**

Petitioner next alleges the state court denied his right to due process and a fair trial when it instructed the jury with CALCRIM No. 316 which informed the jury that it may, rather than must, consider a witness's prior criminal conduct when assessing credibility. He argues that the instruction

---

[4]"RT" refers to the Reporter's Transcript on Appeal.

1    may have influenced the jury not to consider witness Angelina's embezzlement from her employer as

2    negatively affecting her credibility.

3            CALCRIM No. 316, as given by the trial court, provided:

4        If you find that a witness has committed a crime or other misconduct, you may consider that
         fact only in evaluating the credibility of the witness's testimony. ¶ The fact that a witness
5        may have committed a crime or other misconduct does not necessarily destroy or impair a
         witness's credibility. It is up to you to decide the weight of that fact and whether that fact
6        makes the witness look less believable.

7    (LD 4:18 at fn.5.)

8            *1.  Review by State Court*

9            This claim was also presented and rejected on direct appeal to the Fifth DCA. (LD 4:17-18.)

10   Petitioner then presented the claim to the California Supreme Court where it was summarily denied.

11   (LD 6.) The California Supreme Court, by its "silent order" denying review of the Fifth DCA's

12   decision, is presumed to have denied the claim presented for the same reasons stated in the opinion

13   of the Fifth DCA.  Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

14           The appellate court rejected the claim as follows:

15           In *Anderson*, the court stated: "The function of CALCRIM No. 316 is not to inform
         the jury what evidence may or may not be considered. CALCRIM No. 220 informs the jury it
16       must consider 'all the evidence that was received throughout the entire trial.' The function of
         CALCRIM No. 316 is to inform the jury *how* prior crimes evidence may be used. Such
17       evidence may be considered only in evaluating the witness's credibility. Thus, CALCRIM
         No. 220 tells the jury it must consider all evidence and CALCRIM No. 316 limits
18       consideration of prior crimes evidence to the issue of credibility. Defendant does not
         challenge the limitation on the use of prior crimes evidence." (*People v. Anderson, supra*,
19       152 Cal.App.4th at pp. 940-941; see also *People v. Felix* (2008) 160 Cal.App.4th 849, 859
         [same regarding CALCRIM No. 318]. We adopt the reasoning in *Anderson* and hold the trial
20       court neither erred nor denied defendant due process or a fair trial by giving the instruction.

21   (LD 4:18.)

22           *2.  Federal Standard and Review of Claim*

23           A challenge to a jury instruction solely as an error under state law does not state a claim

24   cognizable in a federal habeas corpus action.  Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).  To

25   obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing

26   instruction by itself so infected the entire trial that the resulting conviction violates due process.  Id. at

27   72.  Additionally, the instruction may not be judged in artificial isolation, but must be considered in

28   the context of the instructions as a whole and the trial record.  Id.  The court must evaluate jury

instructions in the context of the overall charge to the jury as a component of the entire trial process. United States v. Frady, 456 U.S. 152, 169 (1982), *citing,* Henderson v, Kibbe,  431 U.S. 145, 154 (1977).  Furthermore, even if it is determined that the instruction violated the petitioner's right to due process, a petitioner can only obtain relief if the unconstitutional instruction had a substantial influence on the conviction and thereby resulted in actual prejudice under Brecht, 507 U.S. at 637 (whether the error had a substantial and injurious effect or influence in determining the jury's verdict). Hanna v. Riveland, 87 F.3d 1034, 1039 (9th Cir. 1996). The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal. Id.

As stated above, in this case the state court determined that the instruction was proper under state law. Federal courts are bound by state court rulings on questions of state law. Oxborrow v. Eikenberry, 877 F.2d 1395, 1399 (9th Cir.), *cert. denied*, 493 U.S. 942 (1989). A "mere error of state law, one that does not rise to the level of a constitutional violation, may not be corrected on federal habeas." Gilmore v. Taylor, 508 U.S. 333, 348-49 (1993) (O'Connor, J., concurring). Further, there is no question that the alleged error did not violate any of Petitioner's federal constitutional rights. The jury instruction was reasonable under any standard. Jurors are presumed to follow their instructions. Jones v. United States, 527 U.S. 373, 394 (1999). The challenged instruction informed the jury how prior crimes evidence may be used. The instruction informed the jury that this evidence could only be used to evaluate the witness' credibility. A separate instruction, CALCRIM No. 220, informed the jury that all evidence must be considered. Respondent further notes correctly that the Ninth Circuit model instructions and Federal Jury Practice and Instructions similarly use "may" rather than "must" in considering prior crimes evidence to determine a witness' credibility. Ninth Cir. Crim. Jury Instr. 4.8 (2003); Kevin F. O'Malley, et al., *Federal Jury Practice and Instructions*, § 15.07 (6th ed. 2008). The claim should be denied.

**C.  Ground Three**

Petitioner claims his trial counsel rendered ineffective assistance by failing to request CALCRIM No. 522, a pinpoint instruction to consider provocation to reduce first degree murder to

second degree murder.

CALCRIM No. 522 provides:

> Provocation may reduce a murder from first degree to second degree [and may reduce a murder to manslaughter]. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. [Also, consider the provocation in deciding whether the defendant committed murder or manslaughter.]

*1.   Review by State Court*

This claim was also presented and rejected on direct appeal to the Fifth DCA. (LD 4:18-21.) Petitioner then presented the claim to the California Supreme Court where it was summarily denied. (LD 6.) The California Supreme Court, by its "silent order" denying review of the Fifth DCA's decision, is presumed to have denied the claim presented for the same reasons stated in the opinion of the Fifth DCA.  Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

The appellate court denied this claim as follows:

> When faced with a claim that defense counsel has provided ineffective assistance at trial, "[w]e presume that counsel rendered adequate assistance and exercised reasonable professional judgment in making significant trial decisions." (*People v. Holt* (1997) 15 Cal.4th 619, 703.) The burden is on the defendant to show both "'that counsel's representation fell below an objective standard of reasonableness; *and* ... that there is a reasonable probability that, but for counsel's unprofessional errors, a determination more favorable to defendant would have resulted. [Citations.] If the defendant makes an insufficient showing on either one of these components, the ineffective assistance claim fails.'" (*Ibid.*) Also, "if the record does not preclude a satisfactory explanation for counsel's actions, we will not, on appeal, find that trial counsel acted deficiently." (*People v. Stewart* (2004) 33 Cal.4th 425, 459.) On a direct appeal, a conviction will be reversed for ineffective assistance of counsel only when the record demonstrates there could have been no rational tactical purpose for counsel's challenged act or omission. (*People v. Lucas* (1995) 12 Cal.4th 415, 442 [reviewing courts reverse convictions on direct appeal on the ground of incompetence of counsel only if the record demonstrates there could be no rational tactical purpose for counsel's omissions]; *People v. Mitcham* (1992) 1 Cal.4th 1027, 1058 [if the record sheds no light on why counsel acted or failed to act in the manner challenged, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the contention must be rejected].)

> Here, defendant's general defense was that he was not the shooter, suggesting that an instruction on provocation might have undermined his claim that he was not present at the shooting. Defense counsel, however, also argued there was evidence defendant was still in love with Angelina and was jealous and angry because she was seeing another man. Both sides argued provocation and voluntary manslaughter, and the court instructed on provocation in the context of voluntary manslaughter when it gave CALCRIM No. 570.[FN7] Under these circumstances, the record sheds no light on the reason defense counsel did not request CALCRIM No. 522, despite arguing the possibility of provocation. Nevertheless, decisions regarding what defense to pursue and what additional instructions to request for a particular defense are tactical decisions, and the record reflects defense counsel may have had

sound tactical reasons for not requesting CALCRIM No. 522, such as a desire not to focus the jurors' attention on second degree murder but to instead focus on persuading them to return a verdict of guilty on the lesser offense of voluntary manslaughter. Defense counsel's failure to request the instruction appears to reflect a reasoned decision not to distract the jurors with other issues in hopes they would conclude the provocation was sufficient to find voluntary manslaughter. Thus, defendant cannot show this record affirmatively discloses a lack of tactical purpose or satisfactory explanation for defense counsel's omission. (*People v. Williams* (1997) 16 Cal.4th 153, 215.) Rather, as the court in *People v. Morales* (1979) 88 Cal.App.3d 259 long ago noted, "the difference between [defense] counsel's approach and appellate counsel's hindsight analysis [of what defense counsel should have done] is simply one of tactics...." (*Id.* at p. 268.) Defendant has not shown defense counsel was ineffective for failing to request CALCRIM No. 522.[FN8]

> FN7. Both parties agreed that lesser included offenses on count 1 included not only second degree murder, but voluntary manslaughter, and that lesser included offenses on counts 2 and 3 included only attempted voluntary manslaughter.

> FN8. Because in this case we conclude either that no errors occurred or that any errors were harmless, we need not address defendant's contention of cumulative error.

(LD 4:19-21.)

### *2. Federal Standard and Review of Claim*

The law governing ineffective assistance of counsel claims is clearly established for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d). <u>Canales v. Roe</u>, 151 F.3d 1226, 1229 (9th Cir. 1998.) In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors. <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984); <u>Lowry v. Lewis</u>, 21 F.3d 344, 346 (9th Cir. 1994). First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. <u>Strickland</u>, 466 U.S. at 687. The petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. <u>Id.</u> at 688; <u>United States v. Quintero-Barraza</u>, 78 F.3d 1344, 1348 (9th Cir. 1995). Judicial scrutiny of counsel's performance is highly deferential. A court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. <u>Strickland</u>, 466 U.S. at 687; <u>Sanders v. Ratelle</u>, 21 F.3d 1446, 1456 (9th Cir.1994).

Second, the petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result ... would have been different," <u>Strickland</u>, 466 U.S. at 694.

1   Petitioner must show that counsel's errors were so egregious as to deprive defendant of a fair trial,

2   one whose result is reliable.  Id. at 688.  The court must evaluate whether the entire trial was

3   fundamentally unfair or unreliable because of counsel's ineffectiveness. Id.; Quintero-Barraza, 78

4   F.3d at 1345; United States v. Palomba, 31 F.3d 1356, 1461 (9th Cir. 1994).

5       A court need not determine whether counsel's performance was deficient before examining

6   the prejudice suffered by the petitioner as a result of the alleged deficiencies.  Strickland, 466 U.S. at

7   697.  Since the defendant must affirmatively prove prejudice, any deficiency that does not result in

8   prejudice must necessarily fail. However, there are certain instances which are legally presumed to

9   result in prejudice, e.g., where there has been an actual or constructive denial of the assistance of

10  counsel or where the State has interfered with counsel's assistance. Id. at 692; United States v.

11  Cronic, 466 U.S. 648, 659, and n. 25 (1984).

12      Ineffective assistance of counsel claims are analyzed under the "unreasonable application"

13  prong of Williams v. Taylor, 529 U.S. 362 (2000).  Weighall v. Middle, 215 F.3d 1058, 1062 (2000).

14  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state

15  court identifies the correct governing legal principle from [United States Supreme Court] decisions

16  but unreasonably applies that principle to the facts of the prisoner's case."  Williams, 529 U.S. at

17  413.  The habeas corpus applicant bears the burden to show that the state court applied United States

18  Supreme Court precedent in an objectively unreasonable manner.  Price v. Vincent, 538 U.S. 634,

19  640 (2003).

20      In this case, Petitioner fails to demonstrate that the state court unreasonably determined that

21  counsel's actions were not constitutionally deficient. The defense strategy was two-fold. On one

22  hand, the defense argued that Petitioner was not the shooter. On the other, the defense argued there

23  was evidence in the record that Petitioner was in love with Angelina and was jealous and angry of

24  Angelina seeing another man. However, this argument was made as an alternative in order to reduce

25  the crime from first degree murder to voluntary manslaughter. The state court reasoned that one

26  possible sound tactical strategy of defense counsel could have been to focus the jury on provocation

27  so as to persuade them to return a verdict on the lesser offense of voluntary manslaughter. By

28  focusing instead on provocation sufficient to reduce the killing from murder to manslaughter, the

1   defense was able to argue provocation without requiring the defense to produce direct evidence of

2   Petitioner's mental state, which would have negated his alternative theory that he was not the

3   shooter. Also, as pointed out by Respondent, a verdict of voluntary manslaughter would have

4   secured Petitioner a sentence substantially less than either first or second degree murder.

5   Accordingly, the state court determination that defense counsel possessed sound tactical reasons for

6   not requesting the provocation instruction was not unreasonable.

7          Furthermore, there is no evidence that Petitioner was provoked. Rather, the record reflected

8   that Petitioner and the victim never had a confrontation. Petitioner surreptitiously approached the

9   victim while the victim was attempting to leave in his vehicle, tapped on the window of the vehicle

10  with his firearm and shot at the victim multiple times. There is absolutely no evidence to show the

11  victim provoked Petitioner. Therefore, defense counsel cannot be faulted for failing to request an

12  inapplicable instruction. And regardless of counsel's failure, Petitioner cannot demonstrate any

13  prejudice. This claim should also be denied.

14  **D.  Ground Four**

15         Finally, Petitioner claims that habeas relief should be granted in light of the cumulative effect

16  of the errors alleged. He asserts the errors violated his due process right to a fair trial.

17         A defendant may prove that he has suffered prejudice based on the cumulative effect of

18  errors. Kyles v. Whitley, 514 U.S. 419, 421-22, 440-41 (1995) (in determining whether exculpatory

19  evidence suppressed by state is sufficiently material to violate Due Process Clause, court is required

20  to assess "cumulative" or "net" effect of all suppressed evidence and commits legal error if it only

21  conducts piecemeal analysis of each item of suppressed evidence); O'Neal v. McAninch, 513 U.S.

22  432, 435-36 (1995) (accepting lower court's assumption that "confusion arising out of a trial court

23  instruction about the state of mind necessary for conviction combined with a related statement by a

24  prosecutor" required habeas corpus relief if "combined" error was not harmless); Fuller v. Roe, 182

25  F.3d 699, 704 (9th Cir.1999) ("cumulative effect of several errors may prejudice a defendant to the

26  extent that his conviction must be overturned"); Cooper v. Fitzharris, 586 F.2d 1325, 1333 (9th

27  Cir.1978) (concluding cumulative effect of alleged errors may demonstrate prejudice), *cert. denied*,

28  440 U.S. 974 (1979).

1   In this case, however, none of the claims raised by Petitioner have merit.  Accordingly,

2   Petitioner cannot demonstrate prejudice resulting from the cumulative effect of the errors, because

3   there are no errors affecting the verdict to accumulate. <u>Villafuerte v. Stewart</u>, 111 F.3d 616, 632, (9th

4   Cir.1997) (*per curiam*). The claim should be rejected.

5   **RECOMMENDATION**

6   Accordingly, IT IS HEREBY RECOMMENDED that the petition for a writ of habeas corpus

7   be DENIED WITH PREJUDICE. It is FURTHER RECOMMENDED that the Clerk of Court be

8   DIRECTED to enter judgment.

9   This Findings and Recommendation is submitted to the assigned District Judge, pursuant to

10   the provisions of Title 28 U.S.C. § 636(b)(1).  Within thirty (30) days after being served with the

11   Findings and Recommendation, any party may file written objections with the Court and serve a

12   copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's

13   Findings and Recommendation."  Any reply to the objections shall be served and filed within

14   fourteen (14) days after service of the objections.  The parties are advised that failure to file

15   objections within the specified time may waive the right to appeal the District Court's order.

16   <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

17

18   IT IS SO ORDERED.

19   **Dated:   February 4, 2010**          **/s/ Gary S. Austin**

20   UNITED STATES MAGISTRATE JUDGE

21

22

23

24

25

26

27

28